**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 18-4455**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

KENDRICK BRINKLEY,

Defendant - Appellant.

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte. Robert J. Conrad, Jr., District Judge. (3:16-cr-00324-RJC-DSC-1)

Argued: January 31, 2020                                        Decided: November 13, 2020

Before GREGORY, Chief Judge, and MOTZ and RICHARDSON, Circuit Judges.

Reversed, vacated, and remanded by published opinion. Judge Motz wrote the opinion, in which Chief Judge Gregory joined. Judge Richardson wrote a dissenting opinion.

**ARGUED:** John Parke Davis, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Charlotte, North Carolina, for Appellant. Amy Elizabeth Ray, OFFICE OF THE UNITED STATES ATTORNEY, Asheville, North Carolina, for Appellee. **ON BRIEF:** Anthony Martinez, Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Charlotte, North Carolina, for Appellant. R. Andrew Murray, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

DIANA GRIBBON MOTZ, Circuit Judge:

To execute an arrest warrant for Kendrick Brinkley, police officers entered a private home. They had neither consent to do so nor a search warrant. Brinkley appeals the district court's denial of his motion to suppress evidence obtained in the home, arguing that the officers lacked the necessary reason to believe both that he (1) resided in the home and (2) would be present when they entered. We agree and so must reverse.

I.

In February 2017, a federal-state task force in Charlotte, North Carolina, sought to execute outstanding arrest warrants. J.A. 113. Brinkley, then subject to an arrest warrant for unlawfully possessing a firearm as a convicted felon, was among the targets. J.A. 111.

A.

Bureau of Alcohol, Tobacco, and Firearms (ATF) Special Agent Jason Murphy oversaw the operation. J.A. 110–11. An ATF analyst first provided Agent Murphy with at least two possible addresses. J.A. 125. Because a water bill for one of these addresses was in Brinkley's name, Agent Murphy initially believed that address was Brinkley's most likely residence. J.A. 125–26. One of the other addresses that the analyst provided was an apartment on Stoney Trace Drive in Mint Hill, North Carolina, J.A. 64, 125–26; no utility bill in Brinkley's name was associated with this address, J.A. 125.

Charlotte-Mecklenburg Police Department Detective Robert Stark, a member of Agent Murphy's task force, also tried to locate Brinkley. J.A. 63–64, 110–11, 125. On February 2, Detective Stark searched for Brinkley on CJLEADS, a North Carolina

2

statewide law enforcement database.[1]  J.A. 64.  Detective Stark found multiple addresses in the database linked to Brinkley.  J.A. 64–66, 154.  Two CJLEADS entries — one for a traffic citation, added January 2, J.A. 155–56, and another from the state department of corrections, added "at some point in January" — were associated with the Stoney Trace apartment, J.A. 64–65, 68.

But other CJLEADS entries that Detective Stark found placed Brinkley at numerous other addresses.  J.A. 74, 87.  One entry, added five days before the January 2 traffic citation, provided an address on Planters View Drive.  J.A. 88, 154.  Another entry, added a month before that, gave an address on Stone Post Road in Charlotte.  J.A. 88, 154.  Older entries, including at least five more from the same year, and others dating further back, listed the Planters View Drive address and still other addresses.  J.A. 74, 154.  Detective Stark did not look into the Planters View Drive address or any of these other addresses.  Rather, "based on the length of time that those addresses had been associated with" Brinkley, Detective Stark believed that they "were probably family addresses" where Brinkley did not reside.  J.A. 89.  But the detective intended to check these other addresses if Brinkley was not found at the Stoney Trace apartment.  J.A. 89.

Detective Stark then found Brinkley's public Facebook page.  J.A. 72–73.  Posts and photos there led him to believe that Brinkley was dating one Brittany Chisholm.  J.A. 73.  Detective Stark searched for Chisholm on CJLEADS and found that she was also

---

[1] Detective Stark also searched for Brinkley on KBCOPS, an internal police department reporting system, but there is no indication in the record that he found anything there.  J.A. 64.

associated with the Stoney Trace apartment. J.A. 73–74. Based on this information, Detective Stark concluded that Brinkley lived there with Chisholm. J.A. 75.

Detective Stark reported his conclusion to Agent Murphy, who came to agree that Brinkley probably resided in the Stoney Trace apartment. J.A. 111–12, 126. Neither officer was certain that they had uncovered Brinkley's address. J.A. 112, 126. Rather, in Agent Murphy's experience, it was "common for someone like Mr. Brinkley . . . to have more than one place where they will stay the night." J.A. 126.

The next day, Agent Murphy, Detective Stark, and three other police officers went to the Stoney Trace apartment to conduct what both Agent Murphy and Detective Stark characterized as a "knock-and-talk" to "start [their] search for Mr. Brinkley." J.A. 75–76, 113, 126–27. The officers intended to "interview the occupants to find out if [he] was indeed there," and to arrest him if he was. J.A. 75, 113. Agent Murphy acknowledged that he "had no idea if [Brinkley] was going to be there that morning," but thought the Stoney Trace apartment was the "most likely address" to "find Mr. Brinkley or evidence of his whereabouts." J.A. 134.

### B.

The five officers arrived at the Stoney Trace apartment around 8:30 AM on Friday, February 3, all wearing clothing identifying themselves as police officers. J.A. 75–77, 91. In Agent Murphy's words, they intended "to basically secure the area and sit up on the house and wait to see if Mr. Brinkley left." J.A. 134. Detective Stark knocked on the front door, and the officers heard movement inside for about a minute. J.A. 77. A woman asked who was there, and Detective Stark answered that it was the police. J.A. 77. The officers

4

heard movement for another minute until Chisholm, wearing pajamas, slowly opened the door. J.A. 77, 114.

Detective Stark informed Chisholm that the officers were looking for Brinkley and asked to enter the apartment. J.A. 96. Chisholm denied that Brinkley was there. J.A. 78, 96, 115, 128. According to Detective Stark, Chisholm grew "very nervous"; her "body tensed" and her "breathing quickened," and she looked back over her shoulder into the apartment. J.A. 78. The officers saw another woman they did not recognize, but later identified as Jermica Prigon, wearing pajamas and folding clothes in the living room. J.A. 79, 97, 116. The officers heard movement coming from a room in the back of the apartment, and both Chisholm and Prigon repeatedly looked back toward that area. J.A. 78–80, 115–16.

Detective Stark again asked if Brinkley was present and if the officers could enter to look for him. J.A. 79, 115. He explained that the police "had information that [Brinkley] was staying at this residence" and "asked for [Chisholm's] permission . . . to come through and just do a walk through to make sure that he was indeed not at the residence." J.A. 115. Chisholm, still seeming nervous, answered that she did not want the police officers to enter her apartment and asked if they had a search warrant authorizing them to do so. J.A. 79, 115.

Detective Stark estimated the entire exchange with Chisholm lasted "a little more than a minute"; Agent Murphy thought it lasted more than three. J.A. 96–97, 129. Both testified that based on Chisholm's demeanor and behavior, Prigon's presence, the movement they heard in the back of the apartment, and the morning hour (8:30 AM), they

5

believed Brinkley was inside. J.A. 81, 117, 133. Agent Murphy testified that the sounds and the women's reactions led him to believe "100 percent that Mr. Brinkley was hiding in the apartment." J.A. 134.

At this point, the officers decided not to follow the original plan to secure the area and wait to see if Brinkley left the home. J.A. 134. Instead, Agent Murphy told Chisholm that he believed she was hiding Brinkley and that the officers were going to enter the apartment to serve an arrest warrant on him. J.A. 81, 117. Then the five uniformed and armed officers entered the apartment. J.A. 99. Detective Stark recalled that he probably entered with his gun drawn; Agent Murphy believed that he did not draw his weapon at this time. J.A. 81, 117. The officers found Brinkley in a bedroom. J.A. 82, 99, 118. They arrested and handcuffed him. J.A. 82, 99, 118.

The officers conducted a protective sweep to check for others hiding in the apartment. J.A. 82, 99, 119. They did not find anyone else but did see digital scales, a plastic baggie containing cocaine base, and a bullet. J.A. 83, 105, 119–20, 131. Chisholm then gave but subsequently revoked verbal consent to search the apartment, so the officers obtained a search warrant, pursuant to which they seized three firearms and magazines. J.A. 83–86, 108–09, 120–23, 159.

## C.

A grand jury indicted Brinkley on two felon-in-possession charges under 18 U.S.C. § 922(g)(1), one charge of possession with intent to distribute cocaine base under 21 U.S.C. § 841(a)(1), and one charge of firearm possession in furtherance of a drug offense under 18 U.S.C. § 924(c)(1)(A). J.A. 8–10. Brinkley moved to suppress the evidence police

6

obtained after entering the Stoney Trace apartment. J.A. 12–15. He denied that he resided in the apartment and explained that he was staying there as Chisholm's overnight guest.[2] J.A. 13, 20. Brinkley argued that when the officers entered the apartment, they lacked reason to believe that he (1) resided in the apartment or (2) would be present there at that time. J.A. 19–23. The district court denied the motion. J.A. 144.

Brinkley entered an unconditional guilty plea to one felon-in-possession charge, the predicate for the arrest warrant. He entered a conditional guilty plea to two other charges arising from the search of the home, reserving the right to appeal the suppression ruling. J.A. 220. The district court sentenced Brinkley to 84 months' imprisonment and three years' supervised release on each count, to run concurrently. J.A. 206, 208. Brinkley timely appealed.

We review the district court's legal conclusions — including determinations of reasonable suspicion and probable cause — de novo, *Ornelas v. United States*, 517 U.S. 690, 699 (1996), and its factual findings for clear error, construing the facts in the Government's favor, *United States v. Alston*, 941 F.3d 132, 136–37 (4th Cir. 2019).

## II.

## A.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S.

---

[2] Whether as a resident or as an overnight guest, Brinkley has standing to assert a Fourth Amendment violation. *See Minnesota v. Olson*, 495 U.S. 91, 98–100 (1990).

Const., amend. IV. In most cases, a search or seizure is unreasonable unless authorized by a warrant. *See, e.g.*, *City of Los Angeles v. Patel*, 576 U.S. 409, 419 (2015); *Katz v. United States*, 389 U.S. 347, 357 (1967). The warrant requirement "ensures that the inferences to support a search are 'drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime,'" *Riley v. California*, 573 U.S. 373, 382 (2014) (quoting *Johnson v. United States*, 333 U.S. 10, 14 (1948)), and so safeguards "the individual's interests in protecting his own liberty and the privacy of his home," *Steagald v. United States*, 451 U.S. 204, 212 (1981).

The warrant requirement carries special force when police seek to enter a private home, which is "afforded the most stringent Fourth Amendment protection." *United States v. Martinez-Fuerte*, 428 U.S. 543, 561 (1976). "With few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no." *Kyllo v. United States*, 533 U.S. 27, 31 (2001). But a valid search warrant of course authorizes police to enter a home.

In some circumstances, an arrest warrant can also allow officers to enter a home in order to apprehend a suspect. But the Supreme Court has held that when police officers seek to enter a home pursuant to an arrest warrant, the Fourth Amendment imposes specific and different requirements for entry based on whether the home is the suspect's own residence or someone else's.

When police armed with an arrest warrant seek to enter a suspect's own home, *Payton v. New York*, 445 U.S. 573 (1980), controls. There the Court concluded that "for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly

8

carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Id.* at 603. The *Payton* Court reasoned that an arrest warrant "will suffice to interpose the magistrate's determination of probable cause between the zealous officer and the citizen," so it is not constitutionally necessary for officers to seek additional judicial authorization before entering a suspect's own home to arrest him. *Id.* at 602–03.

But one year later, in *Steagald v. United States*, 451 U.S. 204, the Court decided that an arrest warrant alone did *not* authorize police to enter a *third party's* home. The Court explained that in this situation, unlike in *Payton*, "two distinct interests" protected by the Fourth Amendment are at stake: not only "[the suspect's] interest in being free from an unreasonable seizure," but also "[the third party's] interest in being free from an unreasonable search." *Id.* at 216. While an arrest warrant may adequately protect the former interest, it does "absolutely nothing to protect [the third party's] privacy interest in being free from an unreasonable invasion and search of [her] home." *Id.* at 213. Consequently, the *Steagald* Court held that, absent exigent circumstances or consent, the Fourth Amendment requires police to obtain a search warrant before trying to apprehend the subject of an arrest warrant in a third party's home. *Id.* at 216.

Because the officers in this case assertedly believed that Brinkley resided in the Stoney Trace apartment — and entered it pursuant solely to the authority of the arrest warrant — *Payton*'s framework applies. We next consider what, exactly, *Payton* requires.

9

B.

The courts of appeals have unanimously interpreted *Payton*'s standard — "reason to believe the suspect is within," 445 U.S. at 603 — to require a two-prong test: the officers must have reason to believe both (1) "that the location is the defendant's residence" and (2) "that he [will] be home" when they enter. *United States v. Hill*, 649 F.3d 258, 262 (4th Cir. 2011). But the quantum of proof necessary to satisfy *Payton* has divided the circuits, with some construing "reason to believe" to demand less than probable cause and others equating the two standards. *See United States v. Vasquez-Algarin*, 821 F.3d 467, 474–77 (3d Cir. 2016) (collecting cases).

In *Hill*, 649 F.3d 258, we declined to join either camp, reasoning that the police there had not satisfied even the lower standard. *Id.* at 263. In this case, however, we cannot reach a conclusion as to *Payton*'s first prong — which was not at issue in *Hill* — without first determining the quantum of proof that reasonable belief requires, and so we must answer that question today.

The courts that interpret reasonable belief to demand less than probable cause have done so with scant explanation. *See Vasquez-Algarin*, 821 F.3d at 474. They simply rest on the logic "that the Supreme Court in *Payton* used a phrase other than 'probable cause' because it meant something other than 'probable cause.'" *United States v. Thomas*, 429 F.3d 282, 286 (D.C. Cir. 2005). At first blush, that certainly seems reasonable. But the courts that have endorsed the view that reasonable belief amounts to probable cause rely on two more compelling rationales.

10

The first is that the Supreme Court itself has often used language apparently equating "reason to believe" with probable cause. *See Vasquez-Algarin*, 821 F.3d at 475–78; *United States v. Jackson*, 576 F.3d 465, 469 (7th Cir. 2009); *United States v. Hardin*, 539 F.3d 404, 416 n.6 (6th Cir. 2008). Years before *Payton*, for instance, the Court concluded that "police had probable cause to search [a] car" when observations gave them "reason to believe that the car was used in the commission of [a] crime." *Cardwell v. Lewis*, 417 U.S. 583, 592 (1974). Similarly, the Court has instructed "that 'the substance of all the definitions of probable cause is a reasonable ground for belief of guilt.'" *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (alteration omitted) (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)). And strikingly, in *Maryland v. Buie*, 494 U.S. 325 (1990), the Court used the language of probable cause to find *Payton*'s reasonable belief standard satisfied, holding that officers with "an arrest warrant and probable cause to believe [the suspect] was in his home . . . were entitled to enter and to search" for him within. *Id.* at 332–33.

The second is that, as the Third Circuit reasoned in *Vasquez-Algarin*, 821 F.3d at 477–80, interpreting *Payton*'s reasonable belief to amount to probable cause is most consistent with the special protections that the Constitution affords to the home. The home has long enjoyed "pride of place in our constitutional jurisprudence." *Id.* at 478; *see, e.g.*, *Florida v. Jardines*, 569 U.S. 1, 6 (2013); *Silverman v. United States*, 365 U.S. 505, 511 (1961). Indeed, *Payton* itself reiterated that "the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." 445 U.S. at 585 (internal quotation marks omitted).

11

*Steagald* sheds particular light on how *Payton* must be interpreted to respect the home's privileged status under the Fourth Amendment. As noted above, when officers armed with an arrest warrant seek to apprehend the suspect in a third party's home, *Steagald*, not *Payton*, controls, and requires police to obtain a search warrant founded on probable cause in order to enter the home. But *Payton* controls when officers *believe* that the suspect resides in a certain home, even if they are mistaken. *See Vasquez-Algarin*, 821 F.3d at 472. Under these circumstances, the home's actual residents are no longer entitled to the judicial authorization founded on probable cause that *Steagald* guarantees; *Payton*'s "reason to believe" standard is all that protects their weighty Fourth Amendment privacy interests. Thus, when police seek to enter a home and are uncertain whether the suspect resides there, interpreting reasonable belief to require less than probable cause "would effect an end-run around . . . *Steagald* and render all private homes . . . susceptible to search by dint of mere suspicion or uncorroborated information and without the benefit of any judicial determination." *Id.* at 480.

It seems to us that interpreting reasonable belief to require probable cause hews most closely to Supreme Court precedent and most faithfully implements the special protections that the Fourth Amendment affords the home. For these reasons, we join those courts "that have held that reasonable belief in the *Payton* context 'embodies the same standard of reasonableness inherent in probable cause.'" *Id.* (quoting *United States v. Gorman*, 314 F.3d 1105, 1111 (9th Cir. 2002)).

12

C.

Applying these requirements here means that before entering the Stoney Trace apartment without a search warrant, the police needed to have probable cause to believe that Brinkley resided there and would be present when they entered. *See Hill*, 649 F.3d at 262. We consider the totality of the circumstances in assessing probable cause. *Florida v. Harris*, 568 U.S. 237, 244 (2013). The "quantity and quality" of information known to officers bear on whether they have probable cause, with less reliable information requiring more corroboration. *See Alabama v. White*, 496 U.S. 325, 330 (1990). With these principles in mind, we turn to *Payton*'s first prong.

III.

The police could satisfy *Payton*'s first prong only if the information known to them at the time they entered the Stoney Trace apartment provided them with probable cause that Brinkley resided there — that is, if the information sufficed for a person of reasonable prudence to believe that Brinkley resided there. *See Ornelas*, 517 U.S. at 696. In investigating Brinkley's residence, Agent Murphy relied exclusively on Detective Stark. Detective Stark's conclusion that Brinkley resided in the Stoney Trace apartment rested on two entries on CJLEADS and Brinkley's public Facebook. This information was somewhat sparse, in that police officers typically rely on considerably more evidence to establish reasonable belief as to a suspect's residence. *See Vasquez-Algarin*, 821 F.3d at 482; *Hardin*, 539 F.3d at 421–22; *see also, e.g.*, *United States v. Hamilton*, 819 F.3d 503, 507 (1st Cir. 2016) (police found the defendant's address in an arrest warrant, postal

13

records, a "public database, booking reports, a National Insurance Crime Bureau accident report, and credit bureau reports"); *United States v. Route*, 104 F.3d 59, 61 n.1 (5th Cir. 1997) (police found the defendant's address in his credit card applications, his car registration, and an electric and water bill in his name and verified that the defendant received mail there). Probable cause, however, looks to the totality of the circumstances and does not require any particular source or kind of information. Accordingly, information gleaned from online sources like CJLEADS and Facebook could be enough to establish probable cause of a suspect's residence in some situations.

But here, the information Detective Stark gathered from CJLEADS did not point to just one address but rather indicated that Brinkley might well be *transient*. Although the two most recent entries that the detective found linked Brinkley to the Stoney Trace apartment, many others — including the two immediately preceding entries, one added just five days earlier[3] — linked Brinkley to other addresses. J.A. 154. The utility bill in Brinkley's name that the ATF analyst initially uncovered was associated with not the Stoney Trace apartment but a different address. J.A. 125–26. This consistent pattern of

---

[3] The dissent calls into question the accuracy of the date associated with this entry, December 28, 2016. *See* Dissenting Op. at 39 n.11. But as Detective Stark explained, "[t]he dates [on CJLEADS] before February 2nd probably would not have changed . . . if it's anything more than a month [before February 2nd] it's probably there and present with what it was" when Detective Stark first searched for Brinkley on CJLEADS. J.A. 88 (confirming that the entry for Planters View Drive is dated December 28, 2016). Thus, we do not, as the dissent suggests, look upon the CJLEADS entries "with less-than-expert eyes" and draw our own conclusions. Dissenting Op. at 38. Rather, we rely on Detective Stark's expert knowledge of the database's inner workings. *See id.* at 39–40 (observing that officers like Detective Stark "often review and navigate [CJLEADS] to determine the date" of "addresses [that] are entered and updated").

14

inconsistent addresses suggests that Brinkley may have tended to stay temporarily in various places rather than residing at any one address. In fact, Agent Murphy himself acknowledged that it was "common for someone like Mr. Brinkley . . . to have more than one place where they will stay the night from time to time."[4] J.A. 126.

But the officers investigated only one place. "[P]olice may rely on the totality of facts available to them in establishing probable cause," but they cannot "disregard facts tending to dissipate probable cause." *Bigford v. Taylor*, 834 F.2d 1213, 1218 (5th Cir. 1988); *accord Hernandez v. United States*, 939 F.3d 191, 201 (2d Cir. 2019). The utility bill in Brinkley's name initially led Agent Murphy to believe that Brinkley resided at the address associated with it, J.A. 125–26 — and with good reason, as utility bills typically constitute strong evidence of a defendant's residence. *See United States v. Graham*, 553 F.3d 6, 13 (1st Cir. 2009). But the officers did not look into this address. Nor did they look into any of the numerous other addresses Detective Stark found on CJLEADS, even those listed multiple times. J.A. 154. Had the officers ruled out any of these alternatives, it could have bolstered their theory that Brinkley resided in the Stoney Trace apartment. *See id.* (officers ruled out prior residence); *cf. United States v. Young*, 835 F.3d 13, 21 (1st Cir. 2016) (no reasonable belief as to residence even where officers eliminated three other

---

[4] Similarly, Detective Stark testified that, based on the CJLEADS entries and other available information, he believed that Brinkley might be found at multiple addresses. J.A. 89 (explaining that while he "believed that [Brinkley] was staying at Stone Trace Drive," he also "believed it might be possible to find him at those other addresses" listed on CJLEADS). Accordingly, the suggestion that Brinkley might be transient originated not with us but with both experienced officers.

possibilities). But because they did not examine any other possibilities, everything hinged solely on their investigation into that one address.

Pursuant to *Payton* and *Steagald*, the officers needed to establish reason to believe not just that Brinkley was *staying* in the Stoney Trace apartment but that he *resided* there. If Brinkley was merely staying as a guest in someone else's home, *Steagald* would require the officers to obtain a search warrant before they could enter it. Detective Stark's discovery that Brinkley was involved with Chisholm, and that Chisholm was associated with the Stoney Trace apartment, certainly provided additional evidence that Brinkley might well have stayed at Chisholm's home, but it did not speak to whether he did so as a resident or as Chisholm's overnight guest. *See United States v. Werra*, 638 F.3d 326, 338 (1st Cir. 2011). Further investigation was necessary to establish probable cause that Brinkley *resided* there.[5]

Police often conduct such further investigation by going to the suspected residence, where they can obtain "recent, eyewitness evidence connecting the suspect to the residence, and often even [observe] conduct by the suspect that demonstrates a tie to the residence" —

---

[5] The dissent, which repeatedly refers to Chisholm as Brinkley's "fiancée," Dissenting Op. at 35, 44, contends that Detective Stark "believed" that Chisholm and Brinkley were "living together before marriage" on Stoney Trace Drive, *id.* at 41. This contention finds scant support in the record. Detective Stark did refer to a single photograph on Brinkley's Facebook page in which Brinkley "appeared to be engaged" to Chisholm, but in the next sentence of his testimony, the detective explained that he "believed they were in a *dating* relationship." J.A. 73. (emphasis added). All other testimony by the officers, and even submissions by the Government, either describe Chisholm and Brinkley as "boyfriend and girlfriend," J.A. 111, 158, or "dating," J.A. 26, 75, 89, 133, 142. Nothing in the record supports the dissent's claim that the officers "believed" that Brinkley and Chisholm were "living together before marriage." Dissenting Op. at 41.

16

"common feature[s]" of cases finding that police satisfied *Payton*'s first prong. *Hardin*, 539 F.3d at 421. Officers gather this kind of evidence, for example, by conducting surveillance at the suspected residence. *See Hamilton*, 819 F.3d at 505 ("police installed a pole camera on [the street outside the residence] for surveillance purposes"); *United States v. Barrera*, 464 F.3d 496, 498–99 (5th Cir. 2006) (officers found three vehicles associated with the suspect at the residence). They also talk to people at or near the residence to gather information from them. *See Graham*, 553 F.3d at 13 (police corroborated an address from an incident report by, *inter alia*, showing a picture of the suspect to a person outside the residence); *Hardin*, 539 F.3d at 407 (officers asked property manager who leased the apartment in question); *United States v. Lovelock*, 170 F.3d 339, 344–45 (2d Cir. 1999) (police confirmed address listed on suspect's arrest warrant with two tenants in building). In short, going to the residence in question opens several possible avenues for the police to gather information about whether the suspect in fact resides there.

The officers in this case explained that they went to the Stoney Trace apartment with precisely this investigatory intent in mind. Detective Stark testified that they planned to conduct a "knock-and-talk" at the door of the apartment. J.A. 76. Agent Murphy confirmed that their intent in doing so "was to interview the occupants to find out if Mr. Brinkley was indeed there." J.A. 113. He further explained that when the officers began speaking with Chisholm at the doorstep, he still intended "to basically secure the area and sit up on the house and wait to see if Mr. Brinkley left." J.A. 134. And when the officers doubted Chisholm's assertion that Brinkley was not inside, Detective Stark "asked for her

17

permission . . . to come through and just do a walk through to make sure that he was indeed not at the residence." J.A. 115.

That the officers went to the apartment to obtain more information to establish that Brinkley resided there underscores that at the time of their arrival, they had a "limited basis to believe" that he did. *Vasquez-Algarin*, 821 F.3d at 481. On the doorstep of the apartment, the police officers did talk to an occupant, but they gathered no evidence as to whether this was Brinkley's residence.[6] The police officers did not even ask Chisholm if Brinkley resided there, but only if he was present — a critical difference under *Steagald*. The unexpected arrival of five armed officers apparently led Chisholm to grow nervous as they pressed her to allow them to enter. And the officers heard someone, or something, moving inside. But these facts did not establish that Brinkley resided in the home. At the time they entered the Stoney Trace apartment, all the officers had was the same "limited basis to believe" that Brinkley resided there that they had when they knocked on the door.

Of course, "the police need not possess . . . rock-solid indicators of residence in order to form a 'reasonable belief' that a suspect resides at a given place." *Graham*, 553 F.3d at 13. But we have seen *no* case finding *Payton*'s first prong satisfied on evidence as thin as the evidence here. The information known to the officers suggested that Brinkley may have stayed temporarily in several places. The officers, however, investigated only

---

[6] If anything, the information they learned raised more questions about whether Brinkley resided there than it answered. For the officers found not just Chisholm but also Prigon, a woman completely foreign to them, folding laundry in pajamas, as a resident would.

18

one.  Though the officers developed a well-founded suspicion that Brinkley might have *stayed* in the Stoney Trace apartment at times, they failed to establish probable cause that he *resided* there.  And because the officers entered the apartment pursuant solely to the authority of the arrest warrant, under *Payton* and its progeny, their entry was unlawful.[7]

IV.

Even if the available information were enough to give police reason to believe that Brinkley resided in the Stoney Trace apartment and so satisfy *Payton*'s first prong, the evidence here falls far short of satisfying *Payton*'s second; that is, the officers failed to establish probable cause that Brinkley would be present in the home when they entered.

In determining reasonable belief as to a suspect's presence, courts assess the signs of presence known to officers before they enter a home.  *See Graham*, 553 F.3d at 14.  Though we now know that the officers' belief that Brinkley would be present proved to be

---

[7] Our determination that the officers failed to establish probable cause in no way denigrates their years of experience.  Nor does it suggest that we have not given "due weight" to the "reasonable inferences" they drew "in light of [their] experience." *Terry v. Ohio*, 392 U.S. 1, 27 (1968); *accord Ornelas*, 517 U.S. at 699.  But experience does not establish probable cause. *See* 2 Wayne R. LaFave, *Search & Seizure* § 3.2(c) (6th ed. 2020) (observing that "experience, without more, is not a fact to be added to the quantum of evidence to determine if probable cause exists, but rather a lens through which courts view the quantum of evidence") (quotation marks and emphasis omitted).  Experienced officers like Agent Murphy and Detective Stark may not render the probable cause requirement a "toothless tiger" through reliance on "cop-on-the-beat intuition[s]." *United States v. Rutkowski*, 877 F.2d 139, 142 (1st Cir. 1989).  Rather, their actions — like those of all law enforcement officers — must be "judged against an objective standard" with a familiar lodestar:  whether the available information sufficed for a "man of reasonable caution" to believe that the search was warranted. *Terry*, 392 U.S. at 22.  Contrary to the dissent's intimations, Dissenting Op. at 42, even experienced officers may sometimes fail to meet this standard.

19

correct, the Fourth Amendment demands that we "prevent hindsight from coloring the evaluation of the reasonableness of a search or seizure." *Martinez-Fuerte*, 428 U.S. at 565.

The Government points to six factors assertedly supporting the officers' belief that Brinkley would be present in the Stoney Trace apartment: (1) the officers' purportedly reasonable belief that he resided there; (2) the morning hour (8:30 AM); (3) Chisholm's delay in opening the door; (4) Chisholm's nervousness; (5) the sounds of movement in the apartment; and (6) Chisholm and Prigon's looks toward the back of the apartment. Response Br. at 26–28.

A substantiated belief as to a suspect's residence is especially important. *See Werra*, 638 F.3d at 340 ("The fact that an individual is known to live at a particular location is one sound reason to expect him or her to be there."). But an ill-founded belief about a suspect's residence does not, and cannot, shore up a belief about his presence there. In *Hill*, for instance, we noted that police went to the defendant's suspected residence "to gain information" and "had documented another primary residence" for the defendant, and we discounted the probative value of other indicia of the defendant's presence accordingly. 649 F.3d at 264. Here, too, the officers went to the Stoney Trace apartment to gather more information. J.A. 89, 113. Moreover, while in *Hill* the police knew of only one other possible primary residence, in this case the officers had documented *multiple* other possible primary residences for Brinkley. Unlike in *Hill*, where the defendant's girlfriend told police that the defendant resided in the home that the officers entered, *id.* at 261 — and the defendant himself had previously told an officer that he had recently moved to the city

20

where the home was located, *id.* — police here had *no* firsthand information about where Brinkley resided.

The officers' uncertainty as to Brinkley's residence undermines the evidentiary strength of any possible signs of his presence. *See Werra*, 638 F.3d at 339 (discounting the probative value of time-of-day evidence for this reason). When police *know* a suspect lives somewhere, generic indicia of presence may suggest that *he* is there, but when police are *uncertain* about where he lives, the same signs suggest only that *someone* is there — not necessarily the suspect. In this case, counting the officers' investigation into whether Brinkley resided in the Stoney Trace apartment as evidence that he would be found inside would condone "bootstrapping," allowing police to establish reasonable belief of presence by poking around a suspected residence until they find "mere signs of life inside." *Vasquez-Algarin*, 821 F.3d at 482. With the officers' uncertainty about where Brinkley resided in mind, we look to the other factors to determine whether they established probable cause that he would be present.

The hour and Chisholm's delay in opening the door offer meager support for the officers' belief under these circumstances. It may be reasonable to assume that an unemployed person would be home at 8:30 AM. *See United States v. Magluta*, 44 F.3d 1530, 1536 (11th Cir. 1995); *United States v. Lauter*, 57 F.3d 212, 215 (2d Cir. 1995). But here the officers did not know whether Brinkley was employed; Agent Murphy acknowledged that Brinkley might not have been home at 8:30 AM because "[h]e may have gone to work." J.A. 134. *Cf. Werra*, 638 F.3d at 340 (not reasonable to assume suspect would be home at 10:00 AM without information about her employment status).

21

And as to the purported delay, Detective Stark testified that Chisholm answered the door no more than two minutes after the officers knocked. J.A. 77. Two minutes is not an unusual amount of time for a woman, in her pajamas, to respond to an unanticipated knock, at 8:30 AM. We do not evaluate the totality of the circumstances by running through a list of factors and ticking off each individually. *See Harris*, 568 U.S. at 244. But viewing both of these factors in tandem with the others, we cannot see how they support probable cause to believe that Brinkley was present in the apartment.

We are left with the noises in the apartment and Chisholm and Prigon's reactions to them and to the police officers. Unlike the "unresponsive noises" in *Hill*, "which could have been voices or a television," 649 F.3d at 264, the sounds of active movement here at least indicated that some living being was present. But as in *Hill*, these sounds were not particularized to the suspect; "at best, the police had reason to believe that *someone* was present." *Id.* (emphasis added). The same goes for Chisholm and Prigon looking toward the source of the noises. Their looks toward the back of the apartment were typical reactions to *any* source of noises. The noises could have been made by anyone, including a child (and police knew that children might be present in the apartment, J.A. 90, 127) or a grandparent, or even a pet. Prigon's unanticipated presence accentuates the point: the officers observed one entirely unexpected person in the apartment before they entered, and they had no reason to think that the noises came from Brinkley rather than some other unknown person.

The only evidence that someone was present that was even arguably particularized to Brinkley was Chisholm's nervousness. But "[i]t is common for most people to exhibit

22

signs of nervousness when confronted by a law enforcement officer whether or not the person is currently engaged in criminal activity." *United States v. Massenburg*, 654 F.3d 480, 490 (4th Cir. 2011) (alteration omitted) (quoting *United States v. Salzano*, 158 F.3d 1107, 1113 (10th Cir. 1998)). Here Chisholm was confronted by five armed officers crowding the door to her apartment. The Government nonetheless insists that Chisholm's nervousness was a response to the officers' questions about Brinkley. But police here did not merely ask if Brinkley was inside or where he might be. From their very first question, the officers conveyed their intent to enter the apartment. J.A. 96, 128. Throughout the conversation, they consistently pressed Chisholm to permit them to enter the apartment. J.A. 79, 115. Chisholm could have been nervous at the prospect of exposing any number of people — for example, an elderly parent or a young child — to five armed policemen.

Chisholm might also have feared for herself. Recent events have underscored how quickly police encounters with Black Americans may escalate, at times fatally. *See Estate of Jones v. City of Martinsburg*, 961 F.3d 661, 673 (4th Cir. 2020).[8] "[W]e recognize that our police officers are often asked to make split-second decisions," *id.*, and we respect the

---

[8] Two months after this case was argued, police in Louisville, Kentucky, barged into the home of Breonna Taylor, a 26-year-old emergency medical technician. The officers entered Taylor's home pursuant to a search warrant, which they obtained to investigate a suspected drug dealer who was purportedly associated with the residence. *See* Tessa Duvall & Darcy Costello, *Louisville Police Pursued "No-Knock" Search Warrant in Fatal Shooting of ER Tech in Her Home*, Louisville Courier J. (June 9, 2020), https:// www.courier-journal.com/story/news/2020/05/12/breonna-taylor-louisville-emt-not-main-target-drug-investigation/3115928001/ [https://perma.cc/3UGF-XQHA]. The officers found neither the suspect nor any drugs in the home, but they shot Taylor eight times, killing her. And this tragedy is hardly an anomaly. *See, e.g.*, Kimberlé Crenshaw, *"You Promised You Wouldn't Kill Me,"* N.Y. Times (Oct. 28, 2019), https://www.nytimes.com/ 2019/10/28/opinion/police-black-women-racism.html [https://perma.cc/6QRN-KUHL].

challenges that law enforcement officers face in the service of our communities. But we cannot ignore this context when making sense of how someone reacted to five armed officers at her door. That would make anyone nervous — including Chisholm, whether Brinkley was inside the apartment or not. And we cannot conclude that Chisholm's understandable response gave rise to probable cause that Brinkley was present within.

To the contrary, Chisholm's reluctance to allow the officers to enter her home without a warrant to do so goes to the "very core" of the Fourth Amendment: "the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Silverman*, 365 U.S. at 511. That right would not mean much if all officers needed to enter a private home was a hunch about a suspect's presence and a resident's understandably nervous reaction to the officers' questioning. *Cf. Jardines*, 569 U.S. at 6 ("This right would be of little practical value if the State's agents could stand in a home's porch or side garden and trawl for evidence with impunity . . . .").

Like *Hill*, 649 F.3d at 260, this case is ultimately about the "centuries-old principle of respect for the privacy of the home." *Wilson v. Layne*, 526 U.S. 603, 610 (1999). In recognition of this constitutionally enshrined principle, "law enforcement officers often rely on independent investigation and observations of the premises to determine whether a suspect is actually inside before entering." *El Bey v. Roop*, 530 F.3d 407, 417 (6th Cir. 2008). But police here conducted no independent investigation or observation of the Stoney Trace apartment to determine whether Brinkley was within. They stacked a hunch about Chisholm's nervousness atop a hunch about Brinkley's residence.

24

When police have limited reason to believe a suspect resides in a home, generic signs of life inside and understandably nervous reactions from residents, without more, do not amount to probable cause that the suspect is present within. This conclusion follows from *Hill*, which for the sake of argument applied the less demanding interpretation of reasonable belief and found even that not met. 649 F.3d at 263. If police could not satisfy that lower standard with generic signs of life coming from a suspect's *known* residence, they surely cannot establish probable cause that a suspect is present based on generic signs of life coming from a potential but uncorroborated residence. All of the facts the officers in this case relied on, viewed together, did not give rise to reason to believe that Brinkley would be present in the Stoney Trace apartment when they entered. To hold otherwise would gut "the most stringent Fourth Amendment protection" that "private dwellings [are] ordinarily afforded." *Martinez-Fuerte*, 428 U.S. at 561.

V.

We hold that reasonable belief amounts to probable cause, and that the police in this case lacked reason to believe Brinkley resided in the Stoney Trace apartment and would be present when they entered. The Fourth Amendment requires a more rigorous showing of cause before officers may lawfully enter a private home under these circumstances.

Accordingly, we reverse the district court's denial of Brinkley's suppression motion and vacate Brinkley's convictions on the two counts at issue. We also vacate Brinkley's sentence, *see United States v. Pratt*, 915 F.3d 266, 275 (4th Cir. 2019), and we remand the case for further proceedings consistent with this opinion.

*REVERSED, VACATED, AND REMANDED*

25

RICHARDSON, Circuit Judge, dissenting:

If equipped with an arrest warrant "founded on probable cause," officers have "the limited authority to enter a dwelling in which the suspect lives when there is *reason to believe* the suspect is within." *Payton v. New York*, 445 U.S. 573, 603 (1980) (emphasis added). Though the Supreme Court used the phrase "reason to believe," my colleagues in the majority hold that officers must have "*probable cause* to believe that [the suspect] resided [at the dwelling] and would be present when they entered." Majority Op. 13 (emphasis added). This divergence from what the Supreme Court said is not without some support. But I would follow the words used in *Payton* until I am told otherwise.

And yet, the majority did not need to wade into this morass. Whatever the standard, the officers here had enough to enter an apartment to arrest Kendrick Brinkley. Those experienced officers made reasonable inferences that deserve our respect. Rather than respecting those inferences and the district court who agreed with them, the majority invents its own inferences with little support from a database with which judges have precious little experience. I respectfully dissent.

## I. Background

Experienced law enforcement, state and federal,[1] sought to arrest Brinkley on an outstanding arrest warrant. To find him, they turned to a North Carolina law-enforcement database, Criminal Justice Law Enforcement Automated Data Services (CJLEADS).

---

[1] Detective Robert Stark had served as a police officer for twelve years. J.A. 63. Special Agent Jason Murphy had worked for the ATF for nine years and had served in other law-enforcement positions for more than seven years before that. J.A. 110.

Using that information, along with court records and Facebook, the officers identified Brinkley's most probable residence as being an apartment on Stoney Trace Drive.

The two most recent records in CJLEADS linked Brinkley to the Stoney Trace address. The first record, from just a month earlier, involved a "ticket citation issued [to Brinkley] for driving while [his] license [was] revoked." J.A. 65. Cross-referencing the North Carolina Courts' system confirmed that Brinkley had provided the Stoney Trace address during the traffic stop. A second record, this one from the Department of Corrections, linked Brinkley to the Stoney Trace address. From this record, the officer concluded that Brinkley gave the Stoney Trace address to his probation officer "as Mr. Brinkley was on probation at the time." J.A. 65. And Brinkley's own counsel agreed this second address was the "probation office['s] indication that that was his residence." J.A. 137. So it was no surprise that the district court found that Stoney Trace was the "place that [Brinkley] gave as a residence." J.A. 145; *see also* J.A. 144 (concluding that the database provided "indicators of Mr. Brinkley giving that as an address, recent in time")

The Stoney Trace address that Brinkley provided was corroborated by information from Facebook. Brinkley's Facebook page showed that Brinkley was engaged to or dating Brittany Chisholm. CJLEADS identified Chisholm's address as the same Stoney Trace address, which the officers felt helped confirm that Brinkley resided there. The district court agreed.

Considering this information together, the lead officers (Detective Stark and Special Agent Murphy) concluded that Brinkley "was residing at the Stoney Trace address." J.A. 74–75. While other addresses "had been provided over a number of years . . . [t]hey

27

appeared [to Detective Stark] to be family-associated addresses." J.A. 74. As one officer explained, the law-enforcement database had no other addresses "within the [prior] year that [they] felt w[ere] credible as a place [Brinkley] was living." J.A. 112–113, 126.

Having concluded that Brinkley likely resided on Stoney Trace, the officers went "to interview the occupants to find out if Mr. Brinkley was indeed there." J.A. 113. After arriving around 8:30am, they knocked on the front door wearing clothing identifying themselves as law enforcement. After hearing movement inside for "just about a minute," they knocked "a few more times and announced 'police'" because "nobody was coming to the door." J.A. 77, 114. Eventually, a female voice asked who was there, and the officers responded that it was the police. After another "minute's worth of movement," a pajama-clad Chisholm "opened [the front door] slowly" to about "[a] full body length wide" so that Detective Stark "could see all the way inside the apartment." J.A. 77.

When asked if Brinkley was inside, Chisholm "became very nervous. Her body tensed. Her breathing quickened. She looked back into the apartment and said, 'He's not here.'" J.A. 78. She "looked back over her shoulder . . . multiple times." J.A. 78. When told that the officers were there to serve an arrest warrant for Brinkley, "Chisholm become more and more . . . nervous . . . constantly looking behind her, stammering, [ ] never really giv[ing] full answers." J.A. 115.

While talking to Chisholm, the officers could hear movement coming from the bedroom area. J.A. 79, 115–16. A second woman, later identified as Jermica Prigon, crossed from the kitchen to the living room in her pajamas and appeared to be "messing with [ ] folding clothes or something." J.A. 79, 116. When another noise came from the

28

bedroom area, the officers saw Prigon "snap[] her head back towards that area to look." J.A. 116. And each time the officers told Chisholm that they believed Brinkley was inside, she "would kind of do . . . a subconscious . . . look back over her shoulder towards the back of the apartment." J.A. 117.

Based on the noise from the bedroom area, Chisholm's movement and demeanor, Prigon's actions, and the time of day, the officers "believed . . . 100 percent that Mr. Brinkley was hiding in the apartment." J.A. 134; *see also* J.A. 81, 117.

The officers then entered the apartment and, unsurprisingly, found Brinkley in the bedroom's hallway. A protective sweep revealed digital scales, a plastic baggie with suspected crack cocaine, and ammunition in a clear box. After obtaining a search warrant, the officers also found three guns.

After Brinkley was indicted, he sought to suppress the seized evidence. The district court held a hearing and found that the officers reasonably believed that Brinkley lived at the Stoney Trace address and that he was there when they entered. The district court based its conclusion on: (1) Detective Stark's CJLEADS and Facebook research, (2) Chisholm's "nervousness" which "[c]ould be explained by the fact that law enforcement was at the door" but "also [was] highly likely to be connected to . . . [the fact that] they were looking for Mr. Brinkley," (3) Chisholm's demeanor and constant looking back, (4) Prigon's looking back toward the bedroom, (5) the noise inside the apartment and the "two women looking back at the direction of the noise," (6) Detective Stark recognizing Chisholm as Brinkley's girlfriend, tying "Chisholm to that address, and [tying] the defendant" to it, and

29

(7) that the officers were there "early in the morning on a week day when a resident would likely be at home." J.A. 144–47.

## II.    Legal Framework

As the majority points out, "a private home . . . is 'afforded the most stringent Fourth Amendment protection.'" Majority Op. 8 (quoting *United States v. Martinez-Fuerte*, 428 U.S. 543, 561 (1976)). That said, officers seeking to execute an arrest warrant may "enter a dwelling in which [a] suspect lives when there is *reason to believe* the suspect is within." *Payton*, 445 U.S. at 603 (emphasis added). Courts have disagreed on what the Supreme Court meant when it said "reason to believe." Is "reason to believe" the same as "probable cause," as the majority suggests? Or does "reason to believe" merely require a "reasonable belief," which may be less than probable cause to believe?[2]

One might read inconsistency into the Supreme Court's use of the terms "reason to believe" or "reasonable belief." As the majority points out, there is some language in Supreme Court opinions that could be read to equate "reason to believe" with "probable cause." *See* Majority Op. 11 (citing *Maryland v. Pringle*, 540 U.S. 366, 371 (2003);

---

[2] Some circuits have equated "reason to believe" and "probable cause." *See United States v. Vasquez-Algarin*, 821 F.3d 467, 480 (3d Cir. 2016); *United States v. Gorman*, 314 F.3d 1105, 1111 (9th Cir. 2002). Others have suggested the same in dicta. *See United States v. Jackson*, 576 F.3d 465, 469 (7th Cir. 2009); *United States v. Hardin*, 539 F.3d 404, 416 n.6 (6th Cir. 2008). On the other hand, some circuits have found that the "reason to believe" standard is less stringent than the "probable cause" standard. *See United States v. Thomas*, 429 F.3d 282, 286 (D.C. Cir. 2005); *Valdez v. McPheters*, 172 F.3d 1220, 1225 n.5 (10th Cir. 1999); *United States v. Lauter*, 57 F.3d 212, 215 (2d Cir. 1995); *United States v. Werra*, 638 F.3d 326, 337 (1st Cir. 2011). And still others have side-stepped the problem. *See United States v. Barrera*, 464 F.3d 496, 501 n.5 (5th Cir. 2006); *United States v. Risse*, 83 F.3d 212, 216 (8th Cir. 1996); *United States v. Magluta*, 44 F.3d 1530, 1535 (11th Cir. 1995).

30

*Cardwell v. Lewis*, 417 U.S. 583, 592 (1974)). But other times, the Supreme Court more plainly equates "reason to believe" with "reasonable suspicion." *See Terry v. Ohio*, 392 U.S. 1, 27 (1968) (An officer may conduct a reasonable search "where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest."). *Compare Maryland v. Buie*, 494 U.S. 325, 337 (1990) (A protective sweep is permitted when a "*reasonable belief*" exists that an area harbors a dangerous individual (emphasis added)), *with id.* at 335–36 ("The sweep lasts no longer than is necessary to dispel the *reasonable suspicion* of danger." (emphasis added)).

As an inferior court judge, I must follow the Supreme Court's guidance. And although we are left with few tools to reconcile the Supreme Court's cases in this area, what we have leads me to conclude that "reason to believe" means a "reasonable belief," which is equivalent to "reasonable suspicion." First, *Payton* itself sets the standard as "*reason to believe* the suspect is within." *Payton*, 445 U.S. at 603. The Supreme Court chose not to use the phrase "probable cause," a phrase it knows how to use. Instead, the Court used "reason to believe," the same phrase it used in *Terry*, the seminal case on reasonable suspicion. *Terry*, 392 U.S. at 27.[3] Second, in *Buie*, a case that the majority relies on, the Supreme Court differentiates "reasonable belief" from "probable cause" by

---

[3] If "reason to believe," as *Terry* uses it, meant "probable cause," then "reasonable suspicion" would mean "probable cause." And yet the Supreme Court has been clear that *Terry*'s standard is "obviously less than is necessary for probable cause." *See Kansas v. Glover*, 140 S. Ct. 1183, 1187 (2020) (quoting *Prado Navarette v. California*, 572 U.S. 393, 397 (2014)).

31

admonishing the Maryland court for requiring the higher probable cause standard and demanding that it instead use the "reasonable belief" standard. *See Buie*, 494 U.S. at 336–37.[4]  I think it a more faithful reading of *Payton* to adhere to the words the Court used, rather than words they did not.[5]

## III.    A "Reason to Believe" Existed

But the dispute over what the Supreme Court meant when they used "reason to believe," at least here, should be academic.  However one understands a "reason to believe," the officers had it here.  Drawing on their experience, the officers drew inferences from the information they had to conclude that Brinkley resided on Stoney Trace.  And

---

[4] The majority instead relies on *Buie's* descriptive phrase that the officers possessed "an arrest warrant *and probable cause* to believe Buie was in his home."  494 U.S. at 332–33 (emphasis added); *see* Majority Op. 11.  This single sentence reflects only that the Supreme Court believed that there was in fact "probable cause to believe Buie was in his home."  *See Buie v. State*, 550 A.2d 79, 80 (Md. 1988) (explaining that the police were surveilling Buie's house and had placed a phone call to confirm he was there before entering under an arrest warrant).  The Supreme Court did not make a broader statement that *Payton* required probable cause, particularly since *Buie* did not address the authority of officers to enter a home pursuant to an arrest warrant.

[5] I understand the majority to be concerned that reading *Payton* to permit warrantless entries into homes with less knowledge than probable cause might "render all private homes . . . susceptible to search by dint of mere suspicion or uncorroborated information and without the benefit of any judicial determination."  Majority Op. 12 (quoting *Vasquez-Algarin*, 821 F.3d at 480).  But the majority creates a straw man, as "mere suspicion or uncorroborated information" is far from how this Court has defined "reasonable belief."  Instead, as the majority fails to recognize, "[a]n objectively reasonable belief," although a quantum of proof less than probable cause, still "must be based on specific articulable facts and reasonable inferences that could have been drawn therefrom."  *United States v. Yengel*, 711 F.3d 392, 397 (4th Cir. 2012).  This is worlds away from a "dint of mere suspicion" that the majority has characterized the "reason to believe" standard as requiring.  Majority Op. 12 (quoting *Vazquez-Algarin*, 821 F.3d at 480).

once at the residence, the circumstances provided a reason to believe that Brinkley was home.

Even using the majority's probable-cause standard, the officers had "probable cause to believe that Brinkley" (1) "resided [at the Stoney Trace address]," and (2) "would be present when they entered." Majority Op. 13. The majority disagrees. But in conducting their analysis, the majority fails to give due weight to the inferences made by experienced officers based on information in a law-enforcement database, a source that we as appellate judges lack significant experience in interpreting.

Probable cause is not weighed "in terms of library analysis by scholars, but as understood by *those versed in the field of law enforcement*." *United States v. Dickey-Bey*, 393 F.3d 449, 453 (4th Cir. 2004) (emphasis added) (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983)). This last part is important. In determining whether probable cause exists, this Court must use a "pragmatic, common sense approach, [ ] defer[ring] to the expertise and experience of law enforcement officers at the scene." *Id.* (citing *Ornelas v. United States*, 517 U.S. 690, 699 (1996)). And we are to give "due weight to inferences drawn from [the] facts by resident judges," who, like local officers, "view[] the facts of a particular case in light of the distinctive features and events of the community." *Ornelas*, 517 U.S. at 699. "The most precise instrument that the judiciary possesses for ensuring the proper balance between the interests that under-gird the Fourth Amendment is the on-the-ground assessment of district courts." *United States v. Bumpers*, 705 F.3d 168, 173 (4th Cir. 2013). Local officers and local judges are in a better position, based on their experience in their own communities, to make logical inferences from facts on the ground. *Ornelas*, 517 U.S.

33

at 699. And when a resident judge agrees with the officers, we should be particularly cautious about rejecting the agreed-upon inferences.[6]

The majority errs by rejecting law enforcement's inferences and replacing them with its own inferences drawn from a sliver of information. And, in doing so, the majority fails to "construe the evidence in the light most favorable to the Government, the prevailing party below," as we must do. *United States v. Seidman*, 156 F.3d 542, 547 (4th Cir. 1998).

A.     **The officers had probable cause to believe Brinkley resided at the Stoney Trace address**

The information known and the inferences made by these experienced officers provided probable cause that Brinkley resided at the Stoney Trace address. *See* J.A. 89, 134. And the information developed when officers visited that address only confirmed that reasonable belief.

Detective Stark testified that the two most recent CJLEADS results pointed to the Stoney Trace address as Brinkley's residence. That address had been provided once to an officer and once to the Department of Corrections. And it was new. This led Detective

---

[6] This does not mean that we defer to local law enforcement's subjective belief that probable cause exists. *United States v. Gray*, 137 F.3d 765, 769 (4th Cir. 1998). That subjective belief is owed no deference. But the underlying *inferences* they make from the facts are entitled to deference. And again, this is not controlling weight: after all, "while officers have the advantage of experience, they do not necessarily have the advantage of neutrality." *United States v. Johnson*, 599 F.3d 339, 343 (4th Cir. 2010). But, "that is where the district courts come in." *Id.* And local district courts' neutral inferences are to be given not controlling, but "due weight," at least as to their "finding[s] that [an] officer was credible and the inference[s made were] reasonable." *Ornelas*, 517 U.S. at 700. This proposition is "an acknowledgement that satellite imagery often cannot replicate community insights and on-the-ground intelligence." *Johnson*, 599 F.3d at 344.

34

Stark to believe that this address was not a "family-associated address[]," but his current residence. J.A. 74. And this inference was supported by Brinkley's fiancée's link to that address.

Detective Stark made several inferences based on his experience in concluding that the Stoney Trace address was Brinkley's residence. First, Brinkley gave those supervising his probation the Stoney Trace address as his residence. J.A. 65, 137.[7] Second, Brinkley gave the Stoney Trace address as his residence to an officer during a traffic stop. J.A. 65. Third, older addresses in the database were likely "family-associated addresses," not Brinkley's current residence. J.A. 74. Fourth, it is common for someone to live with their significant other. And finally, given that the two most recent CJLEADS results listed the same Stoney Trace address where Chisholm lived, Detective Stark concluded that Brinkley lived with her. J.A. 74–75. Hearing the testimony, the district court found these inferences and the resulting conclusion persuasive. J.A. 144–47.

In place of law enforcement's inferences and analysis, the majority looks at a single-page printout from the CJLEADS database and hypothesizes that Brinkley "might well be transient." Majority Op. 14. The majority then suggests that perhaps "Brinkley may have tended to stay temporarily in various places rather than residing at any one address."

---

[7] It is true Detective Stark did not try to find the probation officer to confirm his conclusion, but that "does not mean that [his conclusions] were *unreasonable*." *Wadkins v. Arnold*, 214 F.3d 535, 543 (4th Cir. 2000). Given probation caseloads, it is far from apparent that contacting a probation officer is even a realistic investigative technique. Indeed, Brinkley's PSR shows that when a U.S. Probation Officer tried to contact Brinkley's state probation officer, the state probation officer did not respond. J.A. 246.

Majority Op. 15.[8]  Perhaps the majority's own inferences are reasonable ones.  But even so, an alternative inference from the information does nothing to eliminate probable cause. *See District of Columbia v. Wesby*, 138 S. Ct. 577, 592 (2018) (explaining that "innocent explanations—even uncontradicted ones—do not have any automatic, probable-cause-vitiating effect").[9]

And yet, the majority's own inferences rest on meager information.  The single-page printout from the CJLEADS database on which their alternative hypothesis is based is below.

---

[8] The majority suggests that their transience conclusion originated with the officers. Majority Op. 15 n.4.  But Special Agent Murphy did not say that he thought, based on the CJLEADS data, that it was a reasonable inference that Brinkley lacked a residence. Instead, he only agreed that "someone like Mr. Brinkley" may stay in various places "from time to time." J.A. 126.  But even acknowledging that possibility, he rejected the likelihood of it here. *See id.* ("[A]nything's possible . . . [b]ut I felt that all the facts that we had at that point were pointing to the most likely place he was at was this address at Stoney Trace.").  And Detective Stark did not say that Brinkley may have *resided* at multiple addresses.  He only agreed that "it might be possible to *find* [Brinkley] at those other addresses if he was not located at Stoney Trace Drive." J.A. 89 (emphasis added).  And he too rejected the majority's premise. *See id.* (In response to the question:  "[D]id you deem . . . that it was possible that Mr. Brinkley was staying at one of those other addresses," Detective Stark responded:  "No.  I believed that [Brinkley] was staying at Stoney Trace Drive.").  Ultimately, the testimony that the majority points to amounts to no more than a similar suggestion that it might be possible to find me at my house, but also at my office, my parent's house, a vacation home, or my brother's house, or that I stay at those locations from time to time. *Cf.* J.A. 89 (The other addresses on Brinkley's CJLEADS page were probably "family addresses.").  That would do little to suggest that I am nomadic and lack any residence.

[9] The majority's theory is also a new one, raised only on appeal.  Before the district court, Brinkley's counsel admitted the government "certainly had some basis to believe Mr. Brinkley was residing at 4709 Stoney Trace" and never mentioned transience or a particular alternative residential address during his argument. J.A. 141.



GOVERNMENT
EXHIBIT
_____
PENGAD 800-631-6989

https://cileads.ondemand.sas.com/Search/? sasapp=Criminal+Justice+Server+2.1&saspfs_...    5/31/2017

37

To be clear, this page is not what the officers relied on in February 2017 but is a later-printed example of what the database's *first* page might have looked like at the time. Compared to what the officers saw before arresting Brinkley, this single page includes "more addresses," "changed" addresses, and "changed" dates. J.A. 66–67 (noting Exhibit 1 was made "later" to illustrate the officer testimony and explaining that it included "more addresses" with "different dates besides the addresses," and that the addresses may have changed since February 2, 2017). We are not sure what addresses were added or changed, or what dates were changed. *See* J.A. 66–67, 88. So even if we were looking at this with expert eyes, we would be unable to see what the officers saw. The majority, however, comes at the illustrative printout with less-than-expert eyes and suggests that a reasonable inference from the database was that Brinkley might have been transient.

But even if a sample page could support a new theory, this page only presents us with skeletal information. We have only limited information about the various entries, no information about the types of connections they indicate, no information about who else was linked to the various addresses, nor a plethora of other information that was available to the officers but is not included in the record. *Cf.* J.A. 155 (Exhibit 2 showing an illustrative CJLEADS page that displays when an entry on Exhibit 1 is "clicked on," *see* J.A. 69).

For example, the majority identifies a Planters View address as having been "entered" on December 28, 2016, five days before the traffic stop where Brinkley had

38

identified his address as Stoney Trace.[10] The majority says that the addition of another address "just five days earlier" should undermine the conclusion that Brinkley resided on Stoney Trace. Majority Op. 14. But we know little about the entry listing Planters View, as the record does not include the click-through page for that entry. All we as judges know is that the entry with the Planters View address was updated by someone on December 28, 2016. It seems plausible that Brinkley gave that address to another government actor much earlier than December 28, 2016.[11] Again, officers have experience using this database as part of their job responsibilities. They often review and navigate it to determine the date

_____

[10] Given the import that the majority places on this entry, it should be surprising that neither the government nor defense counsel found it probative enough to specifically mention during their arguments and that the district court did not find it worth discussing when making its ruling.

[11] Even the limited information in the record should make the majority question its own hypothesis. The December 28 entry seems—at least to me based on the CJLEADS printout—to be linked to an earlier criminal charge from 2015: "15CRS228668." And Brinkley was indeed arrested under that criminal case number for breaking and entering in August 2015. *See* J.A. 246 (listing convictions). A reasonable officer could well conclude that an address associated with a 2015 offense was an older address than the one that Brinkley recently provided during a traffic stop and to his probation officer. *Cf.* J.A. 74 (explaining that the other addresses in the database dated to 2008 or 2009)

But even if one doubted the connection above, the majority errs in relying on its hypothesis that the Planters View address was "added [to the system] *just five days*" before Brinkley's traffic offense. Majority Op. 14 (emphasis added). We only know that the offense occurred on January 2, 2017 because the government provided an illustrative click-through page showing as much. J.A. 155 (government's Exhibit 2). The CJLEADS entry that we have reflects an "update" to that entry on March 1, 2017. J.A. 154–55. So we know that the date on the illustrative exhibit does not reflect the date of the traffic stop when Brinkley gave that address as his residence. And yet the majority assumes that the entry date provides useful timing information about the Planters View address.

I say all of this not to indicate that I know how to read the illustrative CJLEADS page any better than the majority. It merely highlights that we, as judges, lack enough information to say that the officers' conclusions were unreasonable.

and frequency with which addresses are entered and updated. So even if we could explore the system and learn more about each entry, our review of their inferences should be deferential. But, given that we cannot, we lack any legitimate basis for finding their inferences in this case to be unreasonable and for substituting our own inferences and conclusions. *Cf. Glover*, 140 S. Ct. at 1188 (crediting the officer's "commonsense inference" that the defendant was likely the driver of the truck when a database search showed that the defendant was the truck's registered owner).

The majority also explains that the database included another entry—though we cannot tell what address or the entry's date—that was linked to a utility bill. *Cf.* J.A. 74 (noting that other addresses on CJLEADS dated to 2008 or 2009). The majority suggests that the utility-bill address is just as likely Brinkley's address because a utility bill "constitute[s] strong evidence of a defendant's residence." Majority Op. 15 (citing *United States v. Graham*, 553 F.3d 6, 13 (1st Cir. 2009)). The majority then says that the officers should have done more to rule out that utility-bill-associated address, even though the majority knows next to nothing about that address. *Id.*[12] Regardless, the majority does not

---

[12] It seems difficult on this record to conclude that this utility bill was the "most reasonably reliable information" as to where Brinkley lived. Appellant Reply 4. The utility bill is not in the record and there is no discussion about when it was sent. For all we know, it could have been from years before the February 3, 2017 arrest. Further, as Detective Stark explained, many of these older addresses were likely "family-associated addresses." J.A. 74. Perhaps a member of the family put Brinkley's name on the water bill, or another family member bears a similar name. *See* J.A. 125–26 (noting a water bill that came back either in "Mr. Brinkley's name, or at least to a Kendrick Brinkley at another address"). All of this is to say, just because the CJLEADS search turned up a utility bill with a different address does not render unreasonable the officers' conclusion that Brinkley lived on Stoney Trace.

give due weight to the fact that the officers considered that address and found that it was likely a "family-associated address[]" or was at least not "credible as a place where [Brinkley] was living." J.A. 74, 113. It might be true that utility-bill-associated addresses are particularly strong indicators of where someone lives in some jurisdictions or at a given time. Or perhaps not. Again, I have not examined an actual CJLEADS profile and had to conclude whether an older utility-bill-associated address is better evidence of where someone lives than an address recently provided twice. But we know the experienced officers considered the utility bill and found it was more likely a family-associated address. *See Ornelas*, 517 U.S. at 700.

The majority also decides that Brinkley's apparent engagement to Chisholm "certainly provided additional evidence that Brinkley might well have stayed at Chisholm's home, but it did not speak to whether he did so as a resident or as Chisholm's overnight guest." Majority Op. 16. It may well be, in some communities, that living together before marriage is unusual. But these officers, based on their own experience, believed differently. And we must "apply the probable cause standard to the facts *in their totality*." *United States v. Thomas*, 913 F.2d 1111, 1115 (4th Cir. 1990) (emphasis added). So even if you might infer that a couple would not live together before marriage, these officers had more information: Brinkley had recently provided that same address during a traffic stop and to his probation officer. So I find it hard to conclude that the officers unreasonably considered his relationship status alongside that information to conclude that Brinkley was living with Chisholm on Stoney Trace.

41

The majority repeatedly presses that the officers could have investigated more. Majority Op. 15–17. And it is true that they could have done more. That is almost always true. But we do not require officers to "exhaust every potential avenue for investigation." *Smith v. Munday*, 848 F.3d 248, 261 (4th Cir. 2017) *(*quoting *Wadkins v. Arnold*, 214 F.3d 535, 543 (4th Cir. 2000) (If officers "could have been more thorough, or even [if] . . . [their] actions may have been mistaken, [that] does not mean that they were *unreasonable*.")).

In sum, the majority failed to give the appropriate weight to the officer's inferences, which were entitled to substantial weight given the limited information in the record and our lack of expertise with this law-enforcement database. And while the officers could have done more, they did not have to. In total, the information here established probable cause to believe Brinkley resided at the Stoney Trace address.

## B. The officers had probable cause to believe that Brinkley would be at the Stoney Trace address when they entered to execute the arrest warrant

The majority's second-prong analysis is plagued by their faulty first-prong analysis. In analyzing the second prong, the majority explains that any belief about Brinkley's presence was undermined by "uncertainty about where Brinkley resided." Majority Op. 21; *id.* at 20 ("[A]n ill-founded belief about a suspect's residence does not, and cannot, shore up a belief about his presence."). The majority is right that the reasonableness of the belief of an arrestee's residence affects the reasonableness of the belief in the arrestee's presence. *See Vasquez-Algarin*, 821 F.3d at 481 (A reasonable belief in an arrestee's residence "alone carries significant weight in establishing probable cause to believe the arrestee is present."). But this means that the majority's improper inferences about

42

Brinkley's residence become the engine behind their conclusion that the officers lacked probable cause to believe Brinkley was present.

The majority acknowledges that the sounds coming from the apartment "at least indicated that some living being was present." Majority Op. 22. But the majority then concludes that the police had "no reason to think that the noises came from Brinkley rather than some unknown person." *Id.* If the officers really had no reason to believe Brinkley resided there, then the majority's conclusion would hold. But if they did have reason to believe Brinkley lived there, they would have some "reason to think that the noises [inside the apartment] came from Brinkley." *Id.*[13]

The noises from inside the apartment, Chisholm's increasing nervousness, and Chisholm and Prigon's responses to the noises suggested that someone else was inside the apartment. And when combined with the reasonable belief that Brinkley resided on Stoney Trace, officers had probable cause to believe that "someone else" was Brinkley.

---

[13] The majority likens this case to *United States v. Hill*, 649 F.3d 258 (4th Cir. 2011). But as the district court found, this case is materially different. In *Hill*, the officers admitted that they did not believe Hill would be present at the residence when they did the search. *Id.* at 263–64 (One officer believed that Hill would not be home because Hill had fled before and that there was an 80 percent chance Hill would not be present when they went to the residence. Another characterized the trip as one "in regards to a fugitive investigation."). And another resident informed the police that Hill was not there and attributed the noise inside the apartment to her sister. *Id.* at 264. In *Hill*, the primary issue, and why no "reason to believe" Hill was present was found, was that the police relied "solely . . . on an unidentified noise coming from within the home." *Id.* at 265. That was not the case here. The officers were sure that Brinkley was present before they entered. *See* J.A. 81, 134. And the majority cannot seriously contend that an unidentified noise was the only evidence the officers had that Brinkley was there after the majority themselves list five other pieces of evidence that would suggest Brinkley was in the apartment. Majority Op. 20. *Hill* simply does not dictate this result.

43

\*                    \*                    \*

Experienced officers used a law-enforcement database and supporting information to concluded that Brinkley resided at the Stoney Trace address. Rejecting their inferences and conclusions, the majority looks at the limited information we have in the record and adopts an alternative theory of the evidence. They posit that Brinkley may have been transient and without a residence—a theory not even argued below. They then suggest that Brinkley providing law enforcement and probation with the same address that his fiancée used could only signify that Brinkley was possibly an overnight guest. The majority then uses their new theory of Brinkley's residence to decide the officers lacked probable cause to believe Brinkley was present at the apartment that morning.

I disagree. But what really matters is that we, as a court far removed from the reality on the ground, are commanded to give due deference to law enforcement's inferences that the local district court agrees with. Giving due weight to those inferences, these officers had probable cause to believe that Brinkley lived with Chisholm on Stoney Trace. And, based on that belief and information developed after they arrived, they had probable cause to believe that Brinkley was present. I respectfully dissent.

44