**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 23-7280**
_____

UNITED STATES OF AMERICA,

        Plaintiff – Appellee,

v.

AUGUSTINE PEREZ; DEANNA COLEMAN,

        Claimants – Appellants,

and

$25,325.00 IN U.S. CURRENCY,

        Defendant.

_____

Appeal from the United States District Court for the Middle District of North Carolina, at Winston-Salem.  Loretta C. Biggs, Senior District Judge.  (1:21-cv-00584-LCB-JLW)

_____

Argued:  September 10, 2025                        Decided:  February 23, 2026

_____

Before BENJAMIN and BERNER, Circuit Judges, and KEENAN, Senior Circuit Judge.

_____

Reversed, vacated, and remanded with instructions by published opinion.  Judge Benjamin wrote the opinion in which Judge Berner and Judge Keenan joined.

_____

**ARGUED:**  Ryan Menter, GEORGETOWN UNIVERSITY LAW CENTER, Washington, D.C., for Appellants.  Nathan Lee Strup, OFFICE OF THE UNITED STATES ATTORNEY, Greensboro, North Carolina, for Appellee.  **ON BRIEF:**  Erica Hashimoto,

Director, Madeline Brown, Student Counsel, Joshua Hyland, Student Counsel, Appellate Litigation Counsel, GEORGETOWN UNIVERSITY LAW CENTER, Washington, D.C., for Appellants.  Randall S. Galyon, Acting United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Greensboro, North Carolina, for Appellee.

———————————

DEANDREA GIST BENJAMIN, Circuit Judge:

The Supreme Court has recognized that a warrantless search of a probationer's home may be reasonable under the Fourth Amendment when it is supported by reasonable suspicion and authorized by a probation condition. But these probationary searches may implicate the independent Fourth Amendment rights of third parties who are not subject to court supervision.

This appeal presents that third-party issue. Federal probation officers conducted warrantless searches of two residences based on their supervision of Augustine Perez, a federal supervisee subject to warrantless search conditions. Officers first searched Perez's reported residence and then searched a separate home, owned by Perez and occupied by Deanna Coleman, based on the officers' belief that Perez resided there as well. At Coleman's home, the officers entered over her objection and initiated a probationary search that ultimately led to the seizure of $25,325 and other items later alleged to be connected to drug trafficking.

The Government brought this civil forfeiture action against the seized currency, alleging that the currency was related to drug trafficking. Coleman and Perez sought return of the currency and, as part of that effort, moved to suppress the evidence found during the residential searches by arguing that the searches violated the Fourth Amendment. The district court denied the motion to suppress and granted summary judgment for the Government.

We reverse. As an initial matter, we conclude that a condition of supervised release that permits a warrantless search of a supervisee's "property" does not permit the

3

government to search real property owned by him and leased by a third-party resident. Additionally, we conclude that in order to rely on Perez's supervised release conditions to search Coleman's residence, the officers must have had probable cause to believe Perez also resided at Coleman's home. We hold that the government did not meet its burden to show probable cause and, therefore, find that the warrantless search of Coleman's home was unconstitutional. Accordingly, the district court erred in denying Perez's and Coleman's motion to suppress, and the defendant currency was improperly seized and not subject to forfeiture.

## I.

## A.

Perez was on federal supervised release and accordingly subject to certain supervised release conditions. His supervised release conditions required that he "permit a probation officer to visit him . . . at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view by the probation officer." J.A. 314. Further, Perez was required to "submit to warrantless search and seizures of person and property as directed by the Probation Officer." *Id.* The release conditions also required him to "notify third parties of risks that may be occasioned by [his] criminal record or personal history or characteristics." *Id.* Perez signed a document stating that he understood and had been provided with a copy of his release conditions.

While on supervised release, Perez lived in Reidsville, North Carolina, initially at a residence located at 140 Teal Drive and later at a residence located at 721 Lawndale Drive.

4

Perez reported his move from Teal Drive to Lawndale Drive to the probation office as required by his supervised release conditions. The probation office made twelve unannounced monthly visits to Perez's new residence at Lawndale Drive after he moved there.

Perez maintained ownership of Teal Drive after he moved and leased the residence to his girlfriend, Coleman. Coleman signed a one-year lease agreement with Perez and moved into Teal Drive with her twelve-year-old daughter. In addition to signing a formal lease, Coleman transferred the utilities to her name.

Nearly a year after Perez moved to Lawndale Drive, the probation office began receiving information from a confidential informant that Perez was not living at his reported address, trafficking drugs, and traveling outside of North Carolina without permission. According to an affidavit submitted by a probation officer, a confidential informant and follow-up investigation by probation officers suggested that Perez was actually residing at Teal Drive. Notably, however, there are no additional details in the record describing the informant's statement or the results of investigative efforts.

Based on this information, along with Perez's supervised release conditions permitting warrantless searches of his "property," probation officers planned to search both Lawndale Drive and Teal Drive on the same day. Following standard practice, the probation officers contacted the local police department to help with the Lawndale Drive search and the county sheriff's office to assist with the Teal Drive search.

5

B.

Probation officers, with assistance from the police department, carried out a search of Lawndale Drive. There, officers located prescription bottles that listed Perez's name and the Teal Drive address.

Perez arrived at Lawndale Drive during the search and was detained upon making contact with the officers. The officers questioned Perez about Teal Drive, but Perez denied any knowledge of that address to the officers. A police dog that was at the scene alerted to Perez's vehicle. The officers searched Perez's vehicle based on the alert and found a trap compartment typically used to store and transport narcotics in the vehicle. The officers also seized seven cell phones from Perez's person during this interaction.

Perez remained handcuffed with two probation officers at Lawndale Drive.

C.

While Perez was detained at Lawndale Drive, probation officers, with help from the sheriff's department, initiated a search at Teal Drive. Coleman was present when law enforcement arrived. The officers spoke with Coleman and told her that they were conducting a probationary search of the residence. She told the officers that she was Perez's girlfriend and asked the officers if they needed a warrant to search the house. The officers responded that they did not need a warrant because they were conducting a probationary search of the house based on Perez's supervised release conditions.

The officers continued their operation at Teal Drive. The officers asked Coleman to wait outside while they searched the home. Coleman, who was dressed in a robe, went to put on clothes. The officers then entered the house without Coleman's permission.

6

When the officers asked Coleman how long she had been living at Teal Drive, Coleman replied that she had been living there for over one year. Coleman and her daughter were then taken outside to wait while the officers searched the home.

While searching the kitchen, officers opened a lemonade container and found a white powdery substance. They also discovered larger quantities of a white powdery substance in a hidden compartment in the kitchen cabinet. The officers believed the white powder was likely a controlled substance, but lab results later revealed that it was not.

After the officers discovered the powder, they asked Coleman for consent to conduct a full search of the residence. Coleman refused. Sheriff's department detectives then requested that the probation officers suspend their search while the sheriff's department submitted a search warrant request for Teal Drive.

The warrant application stated that there was probable cause for a search of Teal Drive based on the white powder found in Coleman's kitchen; the presence of a trap compartment located in Perez's vehicle; prescription medication bottles from the Lawndale Drive search that had Perez's name and the Teal Drive address on them; mail from the Teal Drive house that had Perez's name on it; and the alert on Perez's van from the police dog. Based on these allegations, the sheriff's department received a search warrant for Teal Drive.

Once the search warrant was approved, the sheriff's department performed a more comprehensive search of Teal Drive. The sheriff's deputies used a police dog to assist with the search of the residence. The police dog indicated a positive alert on approximately one gram of cocaine and two grams of heroin, which were located in Coleman's bedroom.

7

The sheriff's department discovered a total of $25,325 in cash behind a vanity mirror and behind a bathroom door in Perez and Coleman's bedroom at Teal Drive. The currency was packaged in rubber bands, and the portion found behind the vanity mirror was banded in $1,000 increments. In the training and experience of the officers conducting the search, it is common practice for drug traffickers to band their proceeds in that manner.

While searching Teal Drive, the officers also located an old passport for Perez, several prescription medication bottles bearing Perez's, and mail addressed to Perez. The officers seized various other items from the residence, including two handguns; numerous rounds of ammunition and magazines; a sentry safe, the key to which was found on Perez's key ring; Crown Royal bags and gloves inside the sentry safe; four plastic baggies containing white powder; 195 30-milligram oxycodone hydrochloride pills; digital scales; a paper ledger recording names and large amounts of currency, much like drug ledgers; one blue and black bag containing a white money bag; two bills addressed to Perez at Teal Drive; and one money counter.

## D.

The Government, as plaintiff, filed this civil forfeiture complaint against the defendant $25,325. The Government sought forfeiture of the defendant currency on the grounds that the currency was related to drug trafficking. Shortly after the complaint was filed, a magistrate judge issued a warrant to arrest the currency, finding probable cause to believe the defendant currency was subject to forfeiture for being related to drug trafficking.

Both Perez and Coleman filed claims for portions of the defendant currency. Perez claimed ownership of $10,445 of the $25,325, and Coleman claimed ownership of the remaining $14,880.

After filing their claims, Perez and Coleman, as claimants, jointly moved to dismiss the complaint and suppress the evidence. They argued that the court should suppress the evidence seized from their homes because the searches were unconstitutional under the Fourth Amendment.[1] The district court denied their motion, and the case proceeded to discovery and dispositive motions.

The district court granted the Government's motion for summary judgment and ordered the defendant currency to be seized. Relying primarily on the evidence seized from the claimants' homes, the district court found that the currency was proceeds of, or traceable to, drug trafficking.

Claimants now appeal the denial of their motion to suppress and the grant of the Government's motion for summary judgment. Because this appeal turns on the constitutionality of the search at Teal Drive, we only address the denial of the motion to suppress as to that residence.[2]

---

[1] The Fourth Amendment's protection against unreasonable searches and seizures applies in civil forfeiture proceedings. *See, e.g.*, *One 1958 Plymouth Sedan v. Pennsylvania*, 380 U.S. 693, 696 (1965); *United States v. Taylor*, 13 F.3d 786, 788 (4th Cir. 1994). The exclusionary rule that prevents the government from using evidence against a defendant obtained in violation of the defendant's Fourth Amendment rights also bars the government from relying on evidence derived from an illegal search to sustain a forfeiture. *One 1958 Plymouth Sedan*, 380 U.S. at 698.

[2] We assume without deciding that the search of Lawndale Drive was constitutional under the Fourth Amendment.

9

II.

"We review the factual findings underlying a motion to suppress for clear error and the district court's legal determinations [regarding the Fourth Amendment] de novo." *United States v. Hashime*, 734 F.3d 278, 282 (4th Cir. 2013) (quoting *United States v. Davis*, 690 F.3d 226, 233 (4th Cir. 2012)).

III.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. Although the Fourth Amendment enumerates persons, houses, papers, and effects, "the home is first among equals," *Florida v. Jardines*, 569 U.S. 1, 6 (2013), and warrantless entry into and search of a home is the "chief evil against which the . . . Fourth Amendment [was] directed," *Payton v. New York*, 445 U.S. 573, 585–86 (1980) (quoting *United States v. U.S. Dist. Ct. for the E. Dist. of Mich.*, 407 U.S. 297, 313 (1972)).

When it comes to the home, the reasonableness of a search is typically demonstrated when law enforcement conducts the search pursuant to a particularized warrant supported by probable cause. *Lange v. California*, 594 U.S. 295, 301 (2021). Indeed, a search conducted without a warrant is "presumptively unreasonable." *Payton*, 445 U.S. at 586; *accord Kyllo v. United States*, 533 U.S. 27, 31 (2001) ("With few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be

answered no."). However, "the warrant requirement is subject to certain exceptions." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006).

One exception to the warrant requirement relates to people on probation or parole. The Supreme Court has said that a warrantless search of a probationer's home, supported by reasonable suspicion of criminal activity and authorized by a probation condition, is reasonable under the Fourth Amendment. *See, e.g.*, *Griffin v. Wisconsin*, 483 U.S. 868, 880 (1987); *United States v. Knights*, 534 U.S. 112, 122 (2001).

In *Griffin*, the Supreme Court found the warrantless search of a state probationer's residence constitutional "because it was conducted pursuant to a valid [state] regulation governing probationers." 483 U.S. at 880. Wisconsin law subjected all state probationers to conditions set out by state regulation. *Id.* at 870. The regulations "permit[ted] any probation officer to search a probationer's home without a warrant as long as his supervisor approves and as long as there are 'reasonable grounds' to believe the presence of contraband." *Id.* at 870–71 (quoting Wis. Admin. Code HSS §§ 328.21(4), 328.16(1) (1981)). The regulations also "ma[de] it a violation of the terms of probation to refuse to consent to a home search." *Id.* at 871. Based on these regulations, officers searched the probationer's apartment and found that the probationer was illegally in possession of a handgun. *Id.* at 871–72.

The Court upheld the search under the "special needs" exception to the warrant requirement. *Id.* at 873–80. To the Court, supervision of probationers "is a 'special need' of the [s]tate permitting a degree of impingement upon privacy that would not be constitutional if applied to the public at large." *Id.* at 875. The Court reasoned that, unlike

11

the public at large, a probationer's liberty interest is restricted by conditions imposed as part of an ongoing criminal sentence. *See id.* at 874 ("Probation is simply one point (or, more accurately, one set of points) on a continuum of possible punishments ranging from solitary confinement in a maximum-security facility to a few hours of mandatory community service."). And the Court further noted that probationary conditions "are meant to assure that the probation serves as a period of genuine rehabilitation and that the community is not harmed by the probationer's being at large." *Id.* at 875.

In *Knights*, the Supreme Court found constitutional the warrantless search of a state probationer's home because it was "supported by reasonable suspicion and authorized by a condition of probation." 534 U.S. at 122. The probationer was subject to a condition requiring him to "[s]ubmit his . . . person, property, place of residence, vehicle, personal effects, to search at anytime, with or without a search warrant, warrant of arrest or reasonable cause by any probation officer or law enforcement officer." *Id.* at 114 (internal quotation marks omitted & ellipsis in original). Based on this condition, an officer, with reasonable suspicion that the probationer was involved in criminal activity, searched the probationer's home, finding evidence leading to the probationer's indictment. *Id.* at 114–16.

This time the Court upheld the search under the totality of the circumstances, balancing the degree of privacy intrusion caused by the search with the government's interest in conducting the search. *Id.* at 118–21. The Court found that the defendant's "status as a probationer subject to a search condition informs both sides of that balance." *Id.* at 119. For the intrusion, the defendant's status as a probationer and the probation

12

condition subjecting his person, residence, and effects to search at any time "significantly diminished [his] reasonable expectation of privacy." *Id.* at 120. And on the government's side, the Court noted the government's interest in monitoring probationers closely because they are statistically more likely to commit a crime than ordinary citizens. *Id.* at 120–21. The Court also noted for the governmental interest that probationers have a stronger incentive than ordinary criminals to hide crimes and destroy evidence because they face supervision and possible revocation of probation without full trial protections. *Id.* at 120. Based on this balancing, the Court ultimately held that "the balance of these considerations requires no more than reasonable suspicion to conduct a search of this probationer's house." *Id.* at 121.

The Supreme Court has also considered the scope of Fourth Amendment protections for court-supervised individuals outside the residential search context. *See Samson v. California*, 547 U.S. 843 (2006). In *Samson*, the Court found constitutional a suspicionless search of a state parolee's person because the parolee agreed in writing to be "subject to search or seizure by a parole officer or other peace officer at any time of the day or night, with or without a search warrant and with or without cause." 547 U.S. at 846 (quoting Cal. Penal Code Ann. § 3067(a)). The Court again reasoned that parole is on the "continuum" of state-imposed punishments such that parolees have fewer expectations of privacy. *Id.* at 850 (internal quotation marks omitted) (quoting *Knights*, 534 U.S. at 119). The Court also reiterated the substantial state interests in "supervising parolees because 'parolees . . . are more likely to commit future criminal offenses.' " *Id.* at 853 (alteration in original) (quoting *Penn. Bd. of Prob. & Parole v. Scott*, 524 U.S. 357, 365 (1998)). To the Court,

13

the "[s]tate's interests in reducing recidivism and thereby promoting reintegration and positive citizenship among probationers and parolees warrant privacy intrusions that would not otherwise be tolerated under the Fourth Amendment." *Id.* (citing *Griffin*, 483 U.S. at 879; *Knights*, 534 U.S. at 121).

With this background for probationary searches in mind, we find the search of Teal Drive unconstitutional for two reasons, each rooted in the protection of Coleman's Fourth Amendment rights as a third-party occupant. First, we conclude that the officers were not permitted to search Teal Drive merely based on Perez' ownership of that property because Coleman resided there as a tenant. And second, we conclude that the officers were required to have probable cause to believe that Perez also resided at Teal Drive before initiating a probationary search of Coleman's home, and they did not meet that standard here.

## A.

The Government first argues that the officers were justified in searching Teal Drive because Perez owned Teal Drive and his release conditions required him to submit to warrantless searches of his "property." To the Government, it's simple: Perez's property can be subject to warrantless searches, and Teal Drive is Perez's property. To evaluate the Government's position, we look to the analogous consent exception to the warrant requirement.

The Fourth Amendment generally allows warrantless entry and search of a home when police obtain the voluntary consent of an occupant of the home. *See Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990). This exception also applies in shared living arrangements, even when an absent co-occupant does not consent to the search. *United*

14

*States v. Matlock*, 415 U.S. 164, 170 (1974) ("[T]he consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared."). A physically present co-occupant's stated refusal to police entry, however, renders a warrantless search unreasonable and invalid as to him. *Georgia v. Randolph*, 547 U.S. 103, 106 (2006).

These rules rest on "widely shared social expectations." *Id.* at 111. For example, a solitary coinhabitant can consent to the search of a shared premises based on the "commonly held understanding[s] about the authority that co-inhabitants may exercise in ways that affect each other's interests." *Id.* (discussing *Matlock*, 415 U.S. at 164). Similarly, a police officer cannot enter a home over the objections of a present cotenant because "the co-tenant wishing to open the door to a third party has no recognized authority in law or social practice to prevail over a present and objecting co-tenant." *Id.* at 114.

That rationale also applies to landlords. A landlord cannot give police consent to conduct a warrantless search of a tenant's home. *Chapman v. United States*, 365 U.S. 610, 616–17 (1961); *see also Randolph*, 547 U.S. at 112 (explaining that a landlord "calls up no customary understanding of authority to admit guests without the consent of the current occupant"). In *Chapman*, the Court found unconstitutional a warrantless search based on a landlord's consent, explaining that the premises were occupied by a tenant and that the landlord had no right to admit police in the tenant's stead. *Chapman*, 365 U.S. at 617.

15

Although the warrantless search of Teal Drive was not conducted by consent, we find that the landlord limitation to the consent exception applies with equal force here.[3] To hold otherwise would allow probation conditions to override settled Fourth Amendment limits and permit warrantless searches of third parties' homes based solely on the landlord's legal status. Therefore, just as a landlord's property interest does not confer authority to consent to the search of a tenant's residence, a probationer's ownership interest does not permit officers to rely on probation conditions to search a tenant-occupied residence.

Accordingly, Perez's ownership of Teal Drive did not authorize probation officers to enter and search the home without a warrant. Because Coleman was the lawful resident of Teal Drive, the warrantless search cannot be justified based on Perez's ownership alone.

---

[3] In cases involving individuals who cohabit with a parolee or probationer, courts have considered whether the rule from *Randolph*, that a present coresident's stated refusal to police entry renders a warrantless search unreasonable as to the objecting coresident, applies. *See, e.g.*, *Smith v. City of Santa Clara*, 876 F.3d 987, 993–94 (9th Cir. 2017); *United States v. Harden*, 104 F.4th 830, 836–38 (11th Cir. 2024). Those courts found that *Randolph* does not apply to probationary searches because non-probationer coresidents who voluntarily live with someone on probation have a lowered reasonable expectation of privacy and assume the risk of lowered Fourth Amendment protections. *See Smith*, 876 F.3d at 993; *Harden*, 104 F.4th at 836–37. But this reasoning does not apply to the landlord-tenant context. Tenants do not have a lowered expectation of privacy nor assume the risk of lowered Fourth Amendment protections simply by renting from a property owner who is on probation. A tenant would not expect their landlord's probation officer to visit their rental property like a coresident would expect their coresident's probation officer to visit their shared property. Therefore, a tenant's expectation of privacy is not diminished by a landlord's probationary status.

16

B.

1.

The government alternatively argues that the officers could search Coleman's house, pursuant to Perez's supervised release conditions, because the officers reasonably believed that Perez also resided in Coleman's home. The government contends that the district court properly applied a reasonable suspicion standard to that inquiry but we disagree and conclude that probable cause is required in order to protect the rights of third parties.

Searches conducted pursuant to supervised release conditions sometimes implicate third-party rights. *See, e.g.*, *United States v. Thabit*, 56 F.4th 1145, 1151 (8th Cir. 2023). That can also be said for entry into and searches of a third party's residence in order to execute an arrest warrant. *United States v. Brinkley*, 980 F.3d 377, 384–86 (4th Cir. 2020). The question for those cases is whether the search is reasonable considering the third party's rights and reasonable expectations of privacy. *See, e.g.*, *id.* at 384 (noting "[the third party's] interest in being free from an unreasonable search" (quoting *Steagald v. United States*, 4551 U.S. 204, 216 (1981) (internal quotation marks omitted & brackets in original)).

Considering those third-party rights, this court in *Brinkley* held that police must have probable cause to believe the suspect named in the arrest warrant resides in the home before entering it to execute the warrant. *Id.* at 386. The court was tasked with determining the level of proof necessary to satisfy a two-prong standard requiring officers to have "reason to believe" both that the location is the suspect's residence and that the suspect will be

17

present at the time of entry. *Id*. at 384–86. Faced with the choice between interpreting "reason to believe" as requiring mere reasonable suspicion or the higher probable-cause standard, the court adopted the latter. *Id*. at 386. In doing so, the court emphasized the heightened Fourth Amendment protections afforded to the home and the significant privacy interests of third parties. *Id*. at 385. As the court explained, when officers seek to enter a home based on their belief that a suspect resides there, the "reason to believe" standard is the only safeguard protecting third parties from unreasonable searches of their home. *Id*. Requiring less than probable cause, the court warned, would "render all private homes . . . susceptible to search by dint of mere suspicion or uncorroborated information" that the arrest warrant subject lived there. *Id*. at 386 (quoting *United States v. Vasquez-Algarin*, 821 F.3d 467, 480 (3rd Cir. 2016)); *id*. at 385–86.

The Fourth Circuit has not addressed third-party rights for probationary searches, but the Eighth and Ninth Circuits have. Our sister circuits held that "[a]n officer must have probable cause to believe a dwelling is the residence of a parolee in order to initiate a warrantless search of a residence not known to be the home of a parolee." *Thabit*, 56 F.4th at 1151 (finding probationary searches unconstitutional because officers lacked probable cause that the probationer lived at a third party's home); *accord United States v. Grandberry*, 730 F.3d 968, 973, 980–82 (9th Cir. 2013) (finding the same and rejecting the government's argument that evidence showing the property was under the control of the parolee was sufficient).

The Eighth Circuit in *Thabit* articulated three reasons for its holding. 56 F.4th at 1151–52. First, the court reasoned that "the potential for violations of the constitutional

18

rights of third parties necessitates a more rigorous standard than reasonable suspicion." *Id.* at 1151 (citing *Motley v. Parks*, 432 F.3d 1072, 1079 (9th Cir. 2005), *overruled in part by, United States v. King*, 687 F.3d 1189, 1189 (9th Cir. 2012) (per curiam)). Second, the court determined that applying this standard imposes only a minimal burden on law enforcement. *Id.* at 1151–52. Law enforcement "possess[es] substantial information needed to locate [parolees], including the address listed on their conditional release forms and information relevant to their underlying arrest and detention." *Id.* at 1152. Third, the court noted that release conditions requiring a parolee to submit to warrantless searches of their residence "nullifies any need for law enforcement to develop a reason to search." *Id.* (emphasis omitted). Law enforcement "simply must possess probable cause that the parolee actually resides at the search location." *Id.*

The Ninth Circuit in *Grandberry* also reasoned that requiring officers to have probable cause to believe that a parolee resides at a particular address before conducting a search there protects the interests of third parties. 730 F.3d at 982. The court also noted that requiring probable cause in this context "implements the 'special protection' 'accorded to the home' under the Fourth Amendment." *Id.* (brackets & ellipsis omitted) (quoting *United States v. Johnson*, 457 U.S. 537, 552 n.13 (1982), *overruled on other grounds by, Griffith v. Kentucky*, 479 U.S. 314 (1987)).

We adopt the Eighth and Ninth Circuits' reasoning, which balances the potential for violations of the constitutional rights of third parties and the government's important interest in supervising parolees and probationers. We hold that an officer must have probable cause to believe a dwelling is the residence of the court-supervised individual to

19

initiate a warrantless search of a residence not known to be the court-supervised individual's home.

This holding not only aligns with our sister circuits, but it is also directly supported by our precedent in *Brinkley*. If the Fourth Amendment requires probable cause to execute an arrest warrant at a third party's home, then it should likewise require probable cause for executing a probationary search at a third party's home. In fact, the government's interest is likely higher and more urgent in executing arrest warrants than in conducting probationary searches, where probation officers have routine contact with their supervisees. Therefore, if probable cause is necessary when the government has a greater interest, it should also be required when that interest is less compelling. Requiring less than probable cause would render "all private homes susceptible to search by dint of mere suspicion or uncorroborated information" that a probationer lives there. *Brinkley*, 980 F.3d at 386 (ellipses omitted) (quoting *Vasquez-Algarin*, 821 F.3d at 480).

2.

To meet this probable cause standard, an officer must have information sufficient for a person of reasonable prudence to believe that the person resides at the home at the time of the search. *See Brinkley*, 980 F.3d at 386. We consider the totality of the circumstances in assessing probable cause. *Florida v. Harris*, 568 U.S. 237, 244 (2013). The "quantity and quality" of information known to officers bears on whether they have probable cause, with less reliable information requiring more corroboration. *See Alabama v. White*, 496 U.S. 325, 330 (1990).

20

Here, the quantity and the quality of the officers' information were insufficient to believe that Perez lived at Teal Drive. The officers relied on only two weakly reliable sources, which did not have adequate corroboration to establish probable cause.

First, the Government points to an affidavit by a probation officer in which he stated that, according to the confidential informant, Perez was living at Teal Drive. The probation officer also stated in his affidavit that "investigative efforts by probation officers, including surveillance" demonstrated that Perez was living at Teal Drive. But there is no additional evidence to support the informant's tip nor any details regarding what the investigation efforts revealed. Notably, Coleman told the officers that she and her daughter had been living at Teal Drive for over a year and never stated that Perez also lived there. Moreover, probation officers visited Perez at Lawndale Drive once a month in the year prior to the simultaneous searches, and Perez was present at each inspection. Indeed, Perez arrived at Lawndale Drive during the search. And two probation officers remained with Perez inside the Lawndale Drive residence as the Teal Drive residence was searched. Given the officers' familiarity with Perez's residence at Lawndale Drive and their contemporaneous knowledge that he was detained there during the search of Teal Drive, the informant's tip regarding Teal Drive is entitled little weight.

Second, the Government notes that the officers found prescription pill bottles with Perez's name and the Teal Drive address printed on it during the search of Lawndale Drive. But this evidence ignores the fact that the officers decided to search Teal Drive before they ever entered Lawndale Drive. Both searches occurred at, or close to, the same time. It is thus unlikely that the officers even knew about the prescription bottles before searching

21

Teal Drive. But even if they did, the Teal Drive address on the prescription bottles was not high-quality information entitled to significant weight, especially considering the officers knew that Perez used to live at Teal Drive. A potentially outdated address on prescription bottles, which may simply reflect Perez's failure to update pharmacy records after his move, does little to support the belief that Perez resided at Teal Drive at the time of the search.

Without any corroborating information, the informant's tip, the fact that some investigation was conducted, and the prescription pill bottles were not sufficient for a person of reasonable prudence to believe that Perez lived at Teal Drive at the time of the search. Because the officers did not meet this probable cause standard, the Teal Drive search was unconstitutional under the Fourth Amendment.[4] Any evidence discovered there should be excluded from this civil forfeiture proceeding.

IV.

For the above reasons, we reverse the district court's order denying the claimants' motion to suppress as to Teal Drive. And because the defendant currency was seized during the search of Teal Drive, we vacate the district court's order granting the Government's

---

[4] If the officers had probable cause to believe that Perez lived at Teal Drive, we would have continued and analyzed the search under the *Knights* balancing test. Third-party privacy interests may still be implicated even when police have probable cause that the home they are searching is the home of the probationer. *See, e.g.*, *Smith*, 876 F.3d at 994 (finding constitutional, under the *Knights* balancing test, a warrantless search of a probationer's home despite a present non-probationer coresident but limiting its conclusion to the facts before it where the police had probable cause that the probationer just participated in a violent felony and was still at large).

22

motion for summary judgment and remand with instructions to dismiss the government's complaint.

*REVERSED, VACATED, AND REMANDED WITH INSTRUCTIONS*